# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE CAPITOL BREACH GRAND JURY
INVESTIGATIONS WITHIN THE
DISTRICT OF COLUMBIA

Grand Jury Action No. 21-20 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol to carry out the constitutional duty of certifying the vote count of the Electoral College of the 2020 Presidential Election.  This ritual of democracy was disrupted by a rioting mob that breached the Capitol and put a temporary halt to the electoral vote count, assaulting members of law enforcement, destroying property, and encouraging others to join in the mayhem along the way.  To date, more than 500 individuals located across the country have been charged, in over 175 misdemeanor informations and over 170 indictments, with criminal offenses in this District resulting from their participation in the attack on the Capitol.

The government's investigation into the Capitol attack began almost immediately after January 6, 2021, with the first defendants arrested and charged the next day.  *See, e.g.*, Arrest Warrant Return, *United States v. Coffman*, Crim. No. 21-4 (CKK) (D.D.C. Jan. 7, 2021), ECF No. 3; Arrest Warrant Return, *United States v. Leffingwell*, Crim. No. 21-5 (ABJ) (D.D.C. Jan. 7, 2021), ECF No. 3; Compl., *United States v. Ochs*, Crim. No. 21-73-2 (BAH) (D.D.C. Jan. 7, 2021), ECF No. 1.  Nearly seven months later, the government has collected massive amounts of information and electronic data in the course of its investigation, which the government describes as "the largest in American history, both in terms of the number of defendants prosecuted and the nature and volume of the evidence."  Gov't's Mem. Regarding Status of Disc. ("Gov't's *Bledsoe*

1

Discovery Mem.") at 2, *United States v. Bledsoe*, Crim. No. 21-204 (BAH) (D.D.C. July 12, 2021), ECF No. 53.  This evidence ranges from video footage from multiple sources and social media posts to location history data and cell tower data for thousands of devices present inside the Capitol.  *See id.* at 3.  Recognizing its obligation to share any exculpatory evidence within this enormous dataset with counsel for the hundreds of Capitol attack defendants, the government retained, on May 28, 2021, an independent contractor, Deloitte Financial Advisory Services, LLP ("Deloitte"), "to assist in document processing, review and production of" this voluminous discovery.  *Id.* at 7.  The government represents that use of Deloitte's expertise in this manner "is vital to the United States'[s] ability to review large data/document productions and is essential to [the government's] ability to prosecute these cases effectively," *id.*, and "to ensure that all defendants obtain meaningful access to voluminous information that may contain exculpatory material" while "adequately protecting the privacy and security interests of witnesses and subjects from whom those materials were derived," *id.* at 9.

Certain of the evidence collected by the government, however, has been presented to grand juries in this District as evidentiary support for felony charges against more than 200 defendants, and "over 6,000" grand jury subpoenas have been issued for the production of significant portions of the information collected by the government.  *Id.* at 4.  The number of indictments and subpoenas—and concomitant grand jury activity—is likely to grow as the investigation continues.  These materials presented to grand juries are or may be shielded from disclosure to Deloitte by Federal Rule of Criminal Procedure 6(e), which prohibits, with narrowly construed exceptions, the disclosure of "matter[s] occurring before the grand jury," FED. R. CRIM. P. 6(e)(2)(B), to any persons or entities.

This general rule prohibiting disclosure of grand jury material contains certain exceptions, including allowing "[d]isclosure of a grand-jury matter," FED. R. CRIM. P. 6(e)(3)(A), to "any government personnel" that a government attorney "considers necessary to assist in performing that attorney's duty to enforce federal criminal law," FED. R. CRIM. P. 6(e)(3)(A)(ii). The government now seeks an order authorizing disclosure to Deloitte, pursuant to Rule 6(e)(3)(A)(ii), of grand jury matters related to the Capitol attack and materials collected in connection with those matters. Gov't's Mot. Authorize Disclosure of Grand Jury Materials ("Gov't's Mot.") at 1, ECF No. 1. In support of this request, the government contends that Deloitte is properly regarded as "government personnel" within the meaning of the exception. *See id.* at 6–8. In the alternative—and presented almost as an after-thought in a *second* supplemental filing to its initial application—the government seeks an order authorizing disclosure under Rule 6(e)(3)(E)(i), which allows a district court to "authorize disclosure . . . of a grand-jury matter," FED. R. CRIM. P. 6(e)(3)(E), "preliminarily to or in connection with a judicial proceeding," FED. R. CRIM. P. 6(e)(3)(E)(i); *see* Gov't's Second Suppl. Mem. Supp. Mot. Authorize Disclosure of Grand Jury Materials ("Gov't's Second Suppl. Mem.") at 1, ECF No. 4.

Undoubtedly, the government has a genuine need for the highly technical expertise offered by Deloitte to provide litigation support and process efficiently the cumbersome myriad forms of electronic data collected in investigating the Capitol attack. Preventing disclosure of grand jury matters within the voluminous Capitol attack dataset to the government's contractor will require the government "to segregate the substantial body of material that may trigger secrecy obligations under Rule 6(e) and provide case-specific mechanisms for its disclosure." Gov't's Second Suppl. Mem. at 5–6. As the government rightly explains, this requirement "threatens to slow the discovery process, delay contemplated trial proceedings, and undermine

the considerable benefits of having a single, secure, searchable database for discovery materials," and further undermines a review process seen by the government "as a practical necessity to comply with its discovery obligations" to produce exculpatory evidence to hundreds of defendants and resolve these cases as expeditiously as possible.  *Id.* at 6.

Nonetheless, for the reasons explained below, the term "government personnel" in Rule 6(e)(3)(A)(ii) permits disclosure of grand jury materials only to employees of public governmental entities and cannot be stretched to include a private contractor such as Deloitte, no matter how compelling the need for disclosure may be.  Further, the government has not made a sufficient showing of particularized need to warrant disclosure under Rule 6(e)(3)(E)(i).  Disclosure to Deloitte is therefore prohibited, and the government's motion to authorize disclosure based on one or the other of these exceptions must be denied.[1]

## I.      BACKGROUND

### A.      January 6, 2021 Attack on the United States Capitol

Two months after the November 3, 2020 presidential election, on January 6, 2021, a joint session of the United States Congress convened at the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election.  Gov't Mot. at 1; *see also United States v. Chrestman*, Case No. 21-mj-218 (ZMF), 2021 WL 765662, at *2 (D.D.C. Feb. 26, 2021).  "The joint session began at approximately 1:00 p.m., with then–Vice President Mike Pence presiding."  *Chrestman*, 2021 WL 765662, at *2.  Shortly after, "the United States House of Representatives and the United States Senate adjourned to separate chambers within the Capitol to resolve an objection raised in the joint session."  *Id.*  "As the House and Senate

---

[1]       This case was assigned to the undersigned Chief Judge pursuant to Local Criminal Rule 57.14, which provides that "the Chief Judge shall . . . determine all matters relating to proceedings before the grand jury."  LCrR 57.14(b).

proceedings took place, a large crowd of protestors gathered outside the Capitol."  *Id.*  Law enforcement officers from the U.S. Capitol Police, who were later joined by officers from the Metropolitan Police Department and other law enforcement agencies, "were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside."  *Id.* (internal quotation marks and citation omitted); *see also* Gov't's Mot. at 1; *United States v. Owens*, Crim. No. 21-286 (BAH), 2021 WL 2188144, at *2 (D.D.C. May 28, 2021).

Soon after 2:00 p.m., a violent mob "forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts."  Gov't's Mot. at 1; *see also, e.g.*, *Chrestman*, 2021 WL 765662, at *2; *Owens*, 2021 WL 2188144, at *2–4.  By one estimate, "the mob on the west side" of the Capitol alone numbered "at least 9,400 people, outnumbering police officers by more than 58 to one."  Gov't's *Bledsoe* Discovery Mem. at 4 (internal quotation marks and citation omitted).  "[M]ayhem broke out inside the building, putting an hours-long halt to the electoral vote count while elected representatives, congressional staff, and members of the press hid in terror from the mob."  *Chrestman*, 2021 WL 765662, at *2 (internal citations omitted).  "The joint session, and thus the constitutional ritual of confirming the results of the 2020 Presidential Election, was effectively suspended until shortly after 8:00 p.m.," *id.* (internal quotation marks and citation omitted), when law enforcement was finally "able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials," Gov't's Mot. at 1.

**B.      Investigation into Capitol Attack and Collection of Evidence**

In the nearly seven months since January 6, 2021, as of July 16, 2021, over 500 individuals have been charged with criminal offenses in this District arising out of their participation in the Capitol attack.  The charges against these defendants range from felonies,

such as assaults on law enforcement and conspiracy, to misdemeanors, such as disruptive or disorderly conduct in the Capitol or on Capitol grounds, with many defendants facing multiple charges.  *See* U.S. Att'y's Off., D.C., *Capitol Breach Cases*, U.S. Dep't of Justice (last updated July 15, 2021), https://www.justice.gov/usao-dc/capitol-breach-cases; Gov't's Mot. at 2.

As part of its investigation into the Capitol attack, the government has collected voluminous amounts of evidence, which it describes as including "more than 14,000 hours" of surveillance footage from the Capitol grounds; "[m]ore than 2,000 hours of body worn camera footage from multiple law enforcement agencies"; "[o]ver 300,000 tips" from members of the public, "including approximately 237,000 digital media tips"; "[o]ver 2,000 digital devices"; "[l]ocation history data" and "[c]ell tower data" for thousands of electronic devices present "inside the Capitol building" on January 6; "[i]nformation" obtained "from the searches of hundreds of accounts maintained with electronic communications service providers and/or remote computing services [sic] providers"; "over one million Parler posts, replies, and related data, collected by" the Federal Bureau of Investigation ("FBI") "from publicly accessible locations on the Internet"; an additional "over one million Parler videos and images (approximately 40 terabytes of data) scraped by an Internet user who voluntarily provided the material to the FBI"; "[s]ubscriber information and two weeks of toll records for hundreds of phone numbers . . . associated with a Google account identified from . . . [a] geofence search warrant"; and "[o]ver 240,000 [FBI] investigative memoranda and attachments."  Gov't's Mot. at 2–3.

As this list suggests, much of the material collected "consists of Electronically Stored Information" and therefore "contains significant metadata that may be difficult to extract and

produce if documents are not processed using specialized techniques." *Id.* at 4.[2]  Due to this need to process correctly metadata, in combination with the still-expanding volume of the material, the government determined that it "would need to employ software tools for both discovery review and trial preparation," requiring "the use of an outside contractor who could provide litigation technology support services, to include highly technical and specialized data and document processing and review capabilities." *Id.* (footnote omitted).  The government has further represented in pending criminal matters related to the Capitol attack, though not in its filings in connection with the instant motion, that, in order to comply with its obligation to produce all exculpatory material to defendants in discovery, the effort is underway to create "a database of materials relevant to the cases arising from the riot on January 6, 2021," Letter from Gov't Counsel to the Court ("Gov't *Jackman* Discovery Letter") at 1, *United States v. Jackman*, Crim. No. 21-378 (TJK) (D.D.C. July 8, 2021), ECF No. 28, that the government will "systematically review[] . . . for potentially discoverable information," *id.* at 3; *see also, e.g.*, Gov't Mem. Regarding Status of Disc. ("Gov't *McCreary* Discovery Mem.") at 7, *United States v. McCreary*, Crim. No. 21-125 (BAH) (D.D.C. July 12, 2021), ECF No. 24 ("Once the database is accessible, [the government] will begin systematically reviewing materials for potentially discoverable information[.]").

C.     **Contract with Deloitte**

On May 28, 2021, the government contracted Deloitte, "a litigation support vendor with extensive experience providing complex litigation technology services to various government agencies," Gov't Mot. at 4–5, to assist in document processing, review, and production of the

---

[2]     The government defines metadata as "information about an electronic document" that "can describe how, when, and by whom [electronically stored information] was created, accessed, modified, formatted, or collected." Gov't Mot. at 4.

voluminous materials collected in the course of the government's investigation and to "populat[e]" the database, Gov't's Discovery Letter at 3; *see also* Gov't's Mot. at 4–5; Gov't's *McCreary* Discovery Mem. at 7.[3]   Though the contract itself has not been submitted as part of the record in this matter, the government states that its "contract with Deloitte contains all applicable personnel and information security requirements required by the Federal Acquisition Regulation[]," 48 C.F.R. § 1 *et seq.*  Gov't's Mot. at 5; *see also* Gov't's Suppl. Mem. Supp. Mot. Authorize Disclosure of Grand Jury Materials ("Gov't's Suppl. Mem.") at 4, ECF No. 2.  As to information security, the government assures the Court that the contract includes "stringent information security protocols that entail the use of data encryption, a dual-container configuration, and other measures."  Gov't's Mot. at 5; *see also* Gov't's Suppl. Mem. at 4.  In addition, "[a]ll data managed by Deloitte" pursuant to the agreement "resides in the Deloitte hosting environment," which complies with federal security parameters.  Gov't's Mot. at 5; *see also* Gov't's Suppl. Mem. at 3–4.

As to personnel, Deloitte employees working on the contract "are bound by a strict confidentiality agreement . . . and are subjected to rigorous security background investigations." Gov't's Mot. at 5; *see also id.* at 7; Gov't's Suppl. Mem. at 4.[4]  They are prohibited from "tak[ing] case-related materials outside of their secure facility, which is managed through a digital access control system with area control and access management."  Gov't's Mot. at 5; *see also* Gov't's Suppl. Mem. at 4.  The U.S. Attorney's Office for the District of Columbia

---

[3]    The government has stated elsewhere that it has already "begun transferring a large volume of materials to Deloitte (as of July 7, 2021, over 200 disks of data and 34,000 Capitol Police records)" and "anticipates that the database," populated with Deloitte's assistance, "will be accessible shortly."  Gov't's *Jackman* Discovery Letter at 3; *see also, e.g.*, Gov't's *McCreary* Discovery Mem. at 7 (similar); Gov't's *Bledsoe* Discovery Mem. at 7 (similar).

[4]    The government further assures the Court that "Deloitte's personnel undergo similar clearance and background investigation procedures as employees" of the U.S. Attorney's Office for the District of Columbia, Gov't's Mot. at 7, without clarifying whether the Deloitte employees supporting the contract in fact hold government-issued security clearances, *see id.* at 5, 7; Gov't's Suppl. Mem. at 4 ("All Deloitte employees supporting the contract . . . are subjected to rigorous security background investigations.").

"supervises and directs the work being performed by Deloitte under the contract," Gov't Mot. at 5, and "[a]t the end of the contract period, Deloitte will be required to return all materials to the government and to sanitize any media in accordance with government-approved procedures," Gov't's Suppl. Mem. at 4.

These precautions notwithstanding, the government's plan to use Deloitte, an outside contractor, to process and review the voluminous data collected by the government is complicated by the procedural posture of a substantial, and increasing, number of the Capitol attack cases. To date, over 170 indictments, charging more than 200 Capitol attack defendants with felony offenses, have been returned by grand juries sitting in this District. Gov't's Mot. at 3. Thus, the materials identified during the investigation of the Capitol attack include "transcripts and exhibits from . . . grand jury presentations" made to obtain those indictments, as well as "thousands of documents" produced to the government in response to the "over 6,000 grand jury subpoenas . . . issued in connection with" the events of January 6. *Id.* The government expects that, as the Capitol attack investigation continues, "the number of cases presented to the grand jury and the number of subpoenas for documents will only continue to grow." *Id.*

As the government recognizes, these materials presented to grand juries "are or may be protected by Federal Rule of Criminal Procedure 6(e)," *id.*, which bars, with limited and strictly construed exceptions, the disclosure of "matter[s] occurring before the grand jury," FED. R. CRIM. P. 6(e)(2)(B), to any persons or entities. Rule 6(e) therefore presumptively prevents the government from disclosing any grand jury matters and related materials to Deloitte in connection with its contract to process, review, and catalogue information related to the Capitol

9

attack, unless one of the exceptions permitting disclosure of grand jury matters in certain circumstances, enumerated in Rule 6(e)(3), applies.

Set against this general prohibition on disclosure designed to protect the secrecy of grand jury proceedings, the government contemplates a *double* disclosure of grand jury materials: first, a wholesale handoff to Deloitte of all such materials and, then, second, production of discrete grand jury materials to individual defendants as pertinent to particular cases to comply with discovery obligations. The government's express goal in making the first disclosure is to facilitate the second disclosure in an easier, more expeditious manner. *See, e.g.*, Gov't's Second Suppl. Mem. at 5 (stating that disclosure to Deloitte will allow prosecutors to more easily "identify [grand jury] material subject to disclosure under the Jencks Act and *Brady*-and-*Giglio* principles"). While the merits of that goal are self-evident, the issue here is whether the first requested bulk disclosure of grand jury material is authorized under Rule 6(e).

### D.    Procedural History

On June 30, 2021, the government moved, in an eight-page application, for an order authorizing the disclosure of grand jury matters related to the Capitol attack to Deloitte pursuant to Federal Rule of Criminal Procedure 6(e)(3)(A)(ii), Gov't's Mot. at 1; *see also* Proposed Order Authorizing Disclosure of Grand Jury Materials Under Fed. R. Crim. P. 6(e)(3)(A)(ii) ("Proposed Order") at 1–2, ECF No. 1-1, which allows the disclosure of grand jury matters to certain "government personnel," FED. R. CRIM. P. 6(e)(3)(A)(ii).[5] In response to the Court's order, *see* Min. Order (June 30, 2021), the government submitted a brief five-page supplemental

---

[5]    This case and all docket entries were initially placed under seal. In response to the Court's order directing the government to explain "the necessity of maintaining this matter under seal in light of Fed. R. Crim. P. 6(e)(6), which requires that '[r]ecords, orders, and subpoenas related to grand-jury proceedings . . . be kept under seal' only 'to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury,'" Min. Order (July 8, 2021) (alteration and omission in original) (quoting FED. R. CRIM. P. 6(e)(6)), the government "withdr[ew] its request for sealing" of this matter, Gov't's Withdrawal of Sealing Request at 1, ECF No. 3. Accordingly, the entire docket was unsealed on July 9, 2021. *See* Min. Order (July 9, 2021).

filing on July 6, 2021, *see* Gov't's Suppl. Mem.[6]  The government was given yet another

opportunity, at its request, to supplement its application, *see* Min. Order (July 13, 2021), which it

did, on July 13, 2021, *see* Gov't's Second Suppl. Mem.  This second, ten-page supplemental

filing modifies the government's initial request to seek, in the event the Court "separately

determines that Deloitte does not qualify as 'government personnel' under Rule 6(e)(3)(A)(ii),"

Gov't's Second Suppl. Mem. at 10, "a disclosure order . . . under Rule 6(e)(3)(E)(i)," *id.* at 1, a

provision allowing a court to "authorize disclosure . . . of a grand-jury matter," FED. R. CRIM. P.

6(e)(3)(E), "preliminarily to or in connection with a judicial proceeding," FED. R. CRIM. P.

6(e)(3)(E)(i).  The government's motion is now ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 6(e) governs, as its title reflects, "Recording and

Disclosing the Proceedings" of a grand jury, FED. R. CRIM. P. 6(e), and "'sets forth in precise

terms to whom, under what circumstances and on what conditions grand jury information may be

disclosed,'" *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019) (quoting *Fund for Const.*

*Gov't v. Nat'l Archives & Recs. Serv.*, 656 F.2d 856, 868 (D.C. Cir. 1981)), *reh'g en banc denied*

(D.C. Cir. July 22, 2019), *cert. denied*, 140 S. Ct. 597 (2020) (mem.).  To start, Rule 6(e)(2)(B)

expressly prohibits the disclosure of "matter[s] occurring before the grand jury" except in cases

where "these rules provide otherwise."  FED. R. CRIM. P. 6(e)(2)(B).  "The only rule to 'provide

otherwise' is Rule 6(e)(3)," *McKeeve*r, 920 F.3d at 845, which enumerates a list of "Exceptions"

to grand jury secrecy, FED. R. CRIM. P. 6(e)(3).

---

[6]     Since the government's initial application failed to cite, let alone discuss, binding, applicable precedent, the
Court directed the government to address in supplemental briefing "how the government's expansive reading of the
term 'government personnel' in Federal Rule of Criminal Procedure 6(e)(3)(A)(ii) to include a private consulting
firm holding a government contract comports with *McKeever v. Barr*, which precedent was not addressed in the
government's motion and requires 'a district court to hew strictly to the list of exceptions to grand jury secrecy.'"
Min. Order (June 30, 2021) (quoting *McKeever v. Barr*, 920 F.3d 842, 846 (D.C. Cir. 2019)).

The D.C. Circuit held, in *McKeever v. Barr*, 920 F.3d 842 (D.C. Cir. 2019), that "Rules 6(e)(2) and (3) together explicitly require secrecy in all other circumstances" except those identified in Rule 6(e)(3)'s exceptions.  *Id.* at 845.  Thus, a district court must "hew strictly to the list of exceptions to grand jury secrecy" set out in Rule 6(e)(3), *id.* at 846, which exceptions are "exhaustive," *id.* at 845, and "'must be narrowly construed,'" *id.* at 847 (quoting *In re Sealed Case*, 250 F.3d 764, 769 (D.C. Cir. 2001)); *see also United States v. Williams*, 504 U.S. 36, 70 n.6 (1992) (noting that Rule 6(e) "plac[es] strict controls on disclosure of 'matters occurring before the grand jury'" (quoting FED. R. CRIM. P. 6(e)) (citing *United States v. Sells Eng'g, Inc.* ("*Sells Eng'g*"), 463 U.S. 418 (1983))).  In the Circuit's binding view, "deviations from the detailed list of exceptions in Rule 6(e) are not permitted."  *McKeever*, 920 F.3d at 846.

## III.   DISCUSSION

The government seeks authorization to disclose "grand jury matters related to the Capitol Breach . . . to Deloitte and its personnel" in order "to assist prosecutors in the performance of their duty to enforce federal criminal laws" by providing "technical litigation support and data processing services," Proposed Order at 2, pursuant to Rule 6(e)(3)(A)(ii), Gov't's Mot. at 1; Gov't's Suppl. Mem. at 1–2.  In the alternative, it seeks an order authorizing the same disclosure to Deloitte pursuant to Rule 6(e)(3)(E)(i), arguing that "the unique circumstances of the Capitol Breach prosecutions fully justify" such an order.  Gov't's Second Suppl. Mem. at 1.  For the reasons explained below, the government has not demonstrated that the requirements for disclosure under either exception are met, and its motion to authorize disclosure of grand jury matters to Deloitte must be denied.

### A.   Disclosure Under Rule 6(e)(3)(A)(ii)

Rule 6(e)(3)(A)(ii) allows the disclosure of grand jury matters to "any government personnel—including those of a state, state subdivision, Indian tribe, or foreign government—

that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law."  FED. R. CRIM. P. 6(e)(3)(A)(ii).[7]  The government argues that "contract employees may be considered 'government personnel' for purposes of Rule 6(e)(3)(A)(ii) when those employees perform necessary prosecutorial functions under government control."  Gov't's Mot. at 6; *see also id.* at 6–7; Gov't's Suppl. Mem. at 2–3. Relying on this interpretation, the government posits that Deloitte, as an independent contractor retained by the government "to assist federal prosecutors in the performance of their duties," qualifies as "government personnel" within the meaning of the exception.  Gov't's Mot. at 6.[8]

Contrary to the position of the government, however, an interpretation of the term "government personnel" in the (A)(ii) exception to encompass a private firm contracted by the government to provide certain services stands in tension with the text of the Rule and its legislative history.  Moreover, such a broad reading of "government personnel" neither comports with the D.C. Circuit's admonition in *McKeever* against interpretations of Rule 6(e) that would "enable the court to 'circumvent' or 'disregard' a Federal Rule of Criminal Procedure," 920 F.3d at 845 (quoting *Carlisle v. United States*, 517 U.S. 416, 426 (1996)) (citing *Dietz v. Bouldin*, 136

---

[7]      Disclosures under Rule 6(e)(3)(A)(ii), on which the government rests its "primary submission," Gov't's Second Suppl. Mem. at 7, may be made without judicial authorization and court order, though the prosecutor is obliged to "promptly provide the court . . . with the names of all persons to whom a disclosure has been made, and must certify that the attorney has advised those persons of their obligation of secrecy under this rule," FED. R. CRIM. P. 6(e)(3)(B).  The government's decision to "nonetheless seek[] such an order here out of an abundance of caution, as case law is not extensive on the issue of what types of independent contractors may constitute 'government personnel,'" *id.*, shows commendable and appropriate caution before making the contemplated massive handoff to a private entity of otherwise-secret grand jury material, particularly since violating Rule 6(e)(2)'s general rule of grand jury secrecy carries potential penalties, including being held in "contempt of court," FED. R. CRIM. P. 6(e)(7); *see also In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1067–70 (D.C. Cir. 1998) (recognizing a private right of action to initiate civil contempt proceedings to enforce Rule 6(e)(2)); *Barry v. United States*, 865 F.2d 1317, 1321 (D.C. Cir. 1989) (same).

[8]      The government further represents that, to ensure full compliance with Rule 6(e), if disclosure is authorized, "Deloitte's employees will be required to adhere to all grand jury secrecy requirements and other applicable laws, regulations, and Department of Justice policies and procedures, including maintaining properly locked and secure storage of grand jury materials, limiting access to grand jury materials, and preventing any improper disclosure of grand jury materials" and the U.S. Attorney's Office "will provide Deloitte a written advertisement as to its obligations with respect to grand jury secrecy and will certify to this Court that it has done so[.]"  Gov't's Mot. at 5; *see also* FED. R. CRIM. P. 6(e)(3)(B).

S. Ct. 1885, 1888 (2016)), nor is supported by decisions of other courts interpreting the (A)(ii) exception.  Deloitte and its employees therefore are not "government personnel" within the meaning of the exception to grand jury secrecy set forth in Rule 6(e)(3)(A)(ii), and disclosure pursuant to (A)(ii) cannot be authorized.

### 1. *Principles Guiding Interpretation of Rule 6(e)(3)(A)(ii)*

The standard "principles of statutory interpretation apply also to federal rules, including the Federal Rules of Criminal Procedure."  *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020); *see also, e.g.*, *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 123 (1989) (applying principles of statutory interpretation to the Federal Rules of Civil Procedure); *United States v. Owen*, 500 F.3d 83, 89–91 (2d Cir. 2007) (same for Federal Rules of Criminal Procedure).  Thus, in interpreting any of the Rules, courts must "'begin with the text.'"  *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (quoting *City of Clarksville v. Fed. Energy Regul. Comm'n*, 888 F.3d 477, 482 (D.C. Cir. 2018)).  In addition, the court may, if necessary, look beyond the text to other "'traditional tools of statutory interpretation,'" including a Rule's "'structure, purpose, and legislative history.'"  *In re Sealed Case*, 932 F.3d 915, 928 (D.C. Cir. 2019) (quoting *Tax Analysts v. IRS*, 350 F.3d 100, 103 (D.C. Cir. 2003)).

In the wake of the D.C. Circuit's decision in *McKeever*, the text carries particularly great weight in the Rule 6(e) context.  The *McKeever* Court determined that Rule 6(e)'s "list of exceptions is exhaustive," 920 F.3d at 845, and therefore deprives a district court of inherent authority to disclose grand jury materials unless one of the exceptions to grand jury secrecy specifically enumerated in Rule 6(e)(3) applies, *see id.* at 845–50.  To reach this conclusion, the panel evaluated the plain text, legislative history, and traditional policies reflected in Rule 6(e), as well as decades of Supreme Court and D.C. Circuit precedent interpreting Rule 6(e) against

the background principle that "'in the absence of a clear indication in a statute or Rule, [courts] must always be reluctant to conclude that a breach of [grand jury] secrecy has been authorized.'" *Id.* at 844 (quoting *Sells Eng'g*, 463 U.S at 425); *see also id.* at 844–45, 846–47 (discussing cases).  The *McKeever* Court determined that these sources conclusively demonstrated that the specificity of Rule 6(e)(3)'s enumerated exceptions reflects "a carefully considered policy judgment by the Supreme Court in its rulemaking capacity, and by the Congress, which in 1977 directly enacted Rule 6(e) in substantially its present form."  *Id.* at 845.  Thus, to avoid "render[ing] the detailed list of exceptions merely precatory" and overturning Congress and the Supreme Court's assessment of when disclosure of grand jury materials is appropriate, *id.* (quoting *Carlisle*, 517 U.S. at 426), a district court must "hew strictly" to the exceptions, *id.* at 846, which in turn "'must be narrowly construed'" and understood to be exclusive, *id.* at 847 (quoting *In re Sealed Case*, 250 F.3d at 769).

In light of the Circuit's instruction in *McKeever* that "the rule-based exceptions" in Rule 6(e)(3) "are an exhaustive list," *In re Appl. of U.S. for Order Pursuant to 28 U.S.C. § 1651(a) Precluding Notice of Grand Jury Subpoena* ("*In re Appl.*"), Case No. 19-wr-10 (BAH), 2019 WL 4619698, at *3 (D.D.C. Aug. 6, 2019), "the text of Rule 6(e) must be interpreted narrowly and precisely, in accord with its plain meaning," *United States v. Thorne*, Crim. No. 18-389 (BAH), 2021 WL 2682631, at *32 (D.D.C. June 30, 2021).

The government attempts to escape this relatively inflexible interpretive frame imposed by *McKeever*, arguing that the Circuit's holding "was rooted in the need to protect the vital purposes of grand jury secrecy" and that the disclosure of historical grand jury materials sought by the appellant in that case "was . . . completely inconsistent with at least one of the purposes for which grand jury secrecy exists."  Gov't's Suppl. Mem. at 3.  In contrast, it claims, "the

safeguards that Deloitte is required to take in ensuring the security and confidentiality of [grand jury] materials," described *supra* Part I.C, render disclosure of grand jury materials to this private contractor "wholly consistent with the long-established purposes of grand jury secrecy." *Id.* Since the requested disclosure to Deloitte does not violate the purposes of grand jury secrecy, the government implies, *McKeever* allows for the term "government personnel" to be read broadly enough to include Deloitte and its employees.

The government correctly observes that the *McKeever* Court sought to uphold, through its construction of Rule 6(e), the important policies of "(1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated," all of which interests are "safeguard[ed]" by the long tradition of grand jury secrecy. *McKeever*, 920 F.3d at 844 (citing *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979)). The government's reasoning, however, completely ignores the analytical process by which the Circuit pursued this goal. "Since the effect of any potential disclosure of grand jury materials 'must be evaluated *ex ante*,' and could 'grow as district courts continue over time to create additional exceptions to grand jury secrecy,'" *Thorne*, 2021 WL 2682631, at *31 (quoting *McKeever*, 920 F.3d at 849), the *McKeever* Court found that these traditional policy considerations "weighed heavily in favor of reading Rule 6(e) narrowly and literally," *id.* Indeed, *McKeever* explicitly states that, "[t]o protect these important interests, . . . [courts] 'must always be reluctant to conclude that a breach of [grand jury] secrecy has been authorized'" by a statute or Rule. 920 F.3d at 844 (quoting *Sells Eng'g,* 463 U.S. at 425). Thus, "*McKeever* explains that Rule 6(e) is the product of 'carefully considered policy judgment by the Supreme Court in its rulemaking capacity, and by the Congress'" as to when disclosure may be allowed,

"which district courts may not circumvent by ignoring the Rule's careful calibrations." *In re Appl.*, 2019 WL 4619698, at *4 (quoting *McKeever*, 920 F.3d at 845).  The *McKeever* Court itself, by construing Rule 6(e)'s exceptions in light of its text, structure, and legislative history while leaving evaluation of the purposes served by the Rule to Congress and the Supreme Court, modeled the correct approach to interpretation of this Rule.  *See* 920 F.3d at 844–49; *Thorne*, 2021 WL 2682631, at *31–32 (describing *McKeever*'s use of various interpretive tools).

In other words, *McKeever* neither requires nor permits district courts to undertake *ex ante* assessment of whether a proposed disclosure of grand jury materials appears to align with the purposes of grand jury secrecy when construing Rule 6(e).  Under the Circuit's logic, this determination rests within the power of the Supreme Court and Congress, as the bodies entrusted with enacting and amending the Federal Rules of Criminal Procedure.  Rather, the task of a district court interpreting an exception to the rule of grand jury secrecy is to "hew strictly" to the text in order to effectuate Congress's and the Supreme Court's judgment as to when disclosure is appropriate.  *McKeever*, 920 F.3d at 846.

The Circuit's conclusion in this regard reflects the position, urged successfully by the government in *McKeever* and elsewhere, that Rule 6(e) is "prescriptive and exhaustive in its terms," and "recognizes only a handful of carefully tailored exceptions" that are confined to their terms.  Br. for Appellee at 14, *McKeever*, 920 F.3d 842 (No. 17-5149), Doc. No. 1702864.  Since "nothing in Rule 6(e) contains a clear indication or affirmative expression of congressional intent to authorize disclosures outside of the express exceptions listed in that rule," in the government's words, "no sound basis exists" to stray from the text when construing the Rule's exceptions.  Br. for Resp't Opp'n Cert. at 11, *McKeever v. Barr*, 140 S. Ct. 597 (2020) (mem.) (No. 19-307); *see also, e.g.*, Pet. for Writ of Cert. at 15, *Dep't of Justice v. House Comm. on Judiciary*, No. 19-

17

1328, 2021 WL 2742772 (July 2, 2021) (mem.) ("[T]his Court has made clear that exceptions to grand-jury secrecy [in Rule 6(e)(3)] must be interpreted narrowly."). By contrast to its position articulated elsewhere, the government now claims that Rule 6(e)'s exceptions should be interpreted—and expanded—to align with the purposes of grand jury secrecy, rather than read literally, because this more flexible approach to Rule 6(e) accommodates its need for outside expertise in the Capitol attack investigation. This view, however, not only represents an expedient relaxation of the government's position expressed in *McKeever* and elsewhere, but also cannot be reconciled with the D.C. Circuit's holding that "deviations from the detailed list of exceptions in Rule 6(e) are not permitted." *McKeever*, 920 F.3d at 846.

In short, *McKeever* mandates "a strict . . . interpretation" of Rule 6(e)'s exceptions, *Thorne*, 2021 WL 2682631, at *32, which may be informed by the text of the Rule, its legislative history, and precedent. The meaning of the term "government personnel" in Rule 6(e)(3)(A)(ii) is considered in light of these interpretive principles.

### 2.    *Text*

A plain-text reading of Rule 6(e)(3)(A)(ii) disfavors the government's proffered interpretation of "government personnel." The government contends "that contract employees may be considered 'government personnel' for purposes of Rule 6(e)(3)(A)(ii) when those employees perform necessary prosecutorial functions under government control." Gov't's Mot. at 6; *see also* Gov't's Suppl. Mem. at 2–3. Though the government offers barely any analysis of the text of the exception, implicit in its argument is an interpretation of the term "government personnel" as including any individual or entity, whether in an employment relationship with the government or not, that (1) carries out "necessary prosecutorial function[s]" and (2) "work[s]

under the control of government prosecutors."  Gov't's Mot. at 7.  This reading of "government personnel" fails for three reasons.

First, the term "government personnel," in common parlance, refers to individuals who are employed by the government.  *In re Grand Jury Proc.*, 158 F. Supp. 2d 96, 106 (D. Mass. 2001) ("[O]n its face, 'government personnel' appears to refer to people in the employ of the government."); *see also, e.g.*, *Burch v. U.S. Dep't of Agric.*, 174 F. App'x 328, 332 (6th Cir. 2006) (finding the "ordinary meaning" of "personnel to be 'a body of persons employed in some service' or 'a body of employees that is a factor in business administration'" (quoting *Bakal Bros., Inc. v. United States*, 105 F.3d 1085, 1089 (6th Cir. 1997))); *DiBacco v. U.S. Dep't of Army*, 234 F. Supp. 3d 255, 277 (D.D.C. 2017) (determining that the phrase "personnel employed by the Agency" in 50 U.S.C. § 3507 refers to individuals currently or previously employed by the CIA), *aff'd*, 926 F.3d 827 (D.C. Cir. 2019); *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362 (D. Conn. 2009) ("The plain meaning of ['personnel'] includes 'a body of persons employed by or active in an organization, service or place of work.'" (emphasis omitted) (quoting *United States v. Sattar*, 314 F. Supp. 2d 279, 298 (S.D.N.Y. 2004))); *Estate of Parsons v. Palestinian Auth.*, 952 F. Supp. 2d 61, 68 (D.D.C. 2013) (same).  Stretching this phrase to reach beyond government employees to cover any individual who performs a service for the government, even if limited to individuals working under government supervision, exceeds the plain meaning of "government personnel" without any indication in the text of (A)(ii) that such a broad reading was intended.

Second, the inference from plain meaning that "government personnel" are restricted to employees of a public governmental entity is bolstered by Rule 6(e)(3)(A)(ii)'s explanatory clause, clarifying that the exempt category of individuals "includ[es] those [personnel] of a state,

state subdivision, Indian tribe, or foreign government." FED. R. CRIM. P. 6(e)(3)(A)(ii).  This

language, which was added to (A)(ii) through the 1985, 2002, and 2004 amendments to Rule

6(e), *see Amendments to Federal Rules of Criminal Procedure* ("*1985 Amendments*"), 471 U.S.

1167, 1171 (1985); *Amendments to Federal Rules of Criminal Procedure* ("*2002 Amendments*"),

535 U.S. 1157, 1186 (2002); Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L.

No. 108-458, tit. VI, subtit. F, § 6501(a)(1)(A), 118 Stat. 3638 (2004) [hereinafter 2004

Amendment]; *infra* Part III.A.3.b, is best read as expanding the "government personnel" initially

covered by the Rule to encompass employees of other public governmental entities.  The

relationship between the term "government personnel" and the explanatory expansion of that

term to employees of non-federal governmental entities suggests that "government personnel"

standing alone referred only to employees of the federal government.  *Cf. Illinois v. Abbott &*

*Assocs., Inc.*, 460 U.S. 557, 567 (1983) (observing, before the 1985 addition of the explanatory

language, that the (A)(ii) "exception [was] limited to federal government personnel performing a

specified federal law enforcement function"); *United States v. Fort*, 472 F.3d 1106, 1112 (9th

Cir. 2007) (noting that, in light of the explanatory clause, "'government personnel' [in Rule

6(e)(3)(A)(ii)] is defined expressly to incorporate not only federal authorities, but also employees

of non-federal governmental entities that are engaged in assisting federal criminal law

enforcement").  If "government personnel" had carried a broader meaning in the first instance, an

explicit textual reference to personnel associated with other public governmental bodies would

not have been needed to bring such individuals within the scope of the exception.  Moreover, that

each of the entities enumerated in the explanatory language is governmental or at least quasi-

governmental in nature indicates that the "personnel" to whom disclosure may be made pursuant

to (A)(ii) must be employed by a public rather than a private entity.  The omission of any private

20

bodies from this enumerated list suggests that a court ought not to infer that the Rule permits

disclosure to such entities.  *See McKeever*, 920 F.3d at 845 ("'Where Congress explicitly

enumerates certain exceptions to a general prohibition, additional exceptions are not to be

implied, in the absence of evidence of a contrary legislative intent.'" (quoting *Andrus v. Glover

Constr. Co.*, 446 U.S. 608, 616–17 (1980))).

Third, the government's proffered interpretation of "government personnel" both reads

limiting language out of the (A)(ii) exception and imposes an extratextual limitation.  The

government contends that persons qualify as "government personnel" if they (1) "perform

necessary prosecutorial functions that cannot reasonably be performed by traditional Civil

Service employees" and (2) "work under the control of government prosecutors."  Gov't Mot.

at 7.  The first prong of this formulation of the standard for classification as "government

personnel" disregards the remaining text of (A)(ii), which further limits the availability of

disclosure to those government personnel "that an attorney for the government considers

necessary to assist in performing that attorney's duty to enforce federal criminal law."  FED. R.

CRIM. P. 6(e)(3)(A)(ii).  The Rule itself, then, imposes two criteria for the (A)(ii) exception to

apply.  First, the individual or entity must be "government personnel."  *Id.*  Even if this

requirement is met, disclosure is not allowed unless the covered personnel is also "necessary to

assist" in the enforcement of federal criminal law.  *Id.*  The government's definition of

"government personnel" conflates these two distinct limitations on disclosure under the (A)(ii)

exception by reading the "personnel" restriction to be coextensive with the "necessity"

restriction.  Under this reading, the "necessity" language becomes superfluous, in violation of the

longstanding canon against surplusage, which "dictates that when construing a statute courts

'give effect, if possible, to every clause and word.'"  *Great Lakes Comnet, Inc. v. FCC*, 823 F.3d

998, 1003 (D.C. Cir. 2016) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").  In contrast, reading "government personnel" to refer to government employees preserves the "necessity" requirement as a separate criterion to permit disclosure, giving meaning to the full text of (A)(ii).  *See In re Grand Jury Proc.*, 158 F. Supp. 2d at 107 (rejecting a similar interpretation of "government personnel" proffered by prosecutors on surplusage grounds).

The second prong of the government's standard adds an extratextual requirement that "government personnel" must "work under the control of government prosecutors."  Gov't's Mot. at 7.  Nowhere does (A)(ii) limit the covered government personnel to employees under the direct supervision or control of prosecutors, nor is such a restriction implied through the "necessity" requirement.  *See* FED. R. CRIM. P. 6(e)(3)(A)(ii).  The government presumably proposes this criterion because it recognizes that, absent some requirement of control, its interpretation renders the phrase "government personnel" meaningless, as any outside entity whose assistance the government deems necessary could fit within its broad construction of the exception.  Yet the government's acknowledgment that the phrase "government personnel" implies a requirement of control by the government in fact supports a reading of the term as referring to government employees, as the only individuals who are fully subject to government control in the performance of their duties.

The text of (A)(ii), then, supports a narrow construction of "government personnel" as referring to public governmental entities and individuals employed by public governmental entities.  As explained below, examination of the legislative history of the exception only strengthens this interpretation.

### 3.     *Legislative History*

Rule 6(e) has been amended repeatedly since its initial enactment in 1946.[9]  Most relevant here, the "government personnel" exception now codified at Rule 6(e)(3)(A)(ii) was first added in the 1977 amendments to the Rule.  *See* Act of July 30, 1977, Pub. L. No. 95-78, § 2(a), 91 Stat. 319.  That version of (A)(ii) provided for disclosure of grand jury matters to "such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce Federal criminal law."  *Id.*  The exception was amended in 1985 to make clear that "government personnel" includes the "personnel of a state or subdivision of a state," *1985 Amendments*, 471 U.S. at 1171; *see also Communication from the Chief Justice of the Supreme Court Transmitting Amendments to the Federal Rules of Criminal Procedure*, H.R. DOC. NO. 99-64, at 2 (1985), and was revised again in 2002 and 2004 to expand (A)(ii)'s coverage to the personnel of Indian tribes and foreign governments, respectively, *see 2002 Amendments*, 535 U.S. at 1186; 2004 Amendment § 6501(a)(1)(A).  The legislative history of these amendments indicates that the (A)(ii) exception was consistently intended to create only a narrow provision for disclosure of grand jury matters, restricted to employees of public governmental entities assisting federal prosecutors in the enforcement of federal criminal law.

### a.     **The 1977 Amendment**

"Rule 6(e), as it stood from 1946 to 1977, contained no provision for access to grand jury materials by non-attorneys assisting government attorneys."  *Sells Eng'g*, 463 U.S. at 436 (footnote omitted).  "[T]he original Rule . . . set forth [only] three exceptions to grand jury secrecy," *In re Grand Jury Proc.*, 158 F. Supp. 2d at 108, one of which allowed for disclosure to

---

[9]     The current version of Rule 6(e)(3)(A)(ii) was enacted by Congress in 2004.  *See* 2004 Amendment § 6501(a)(1)(A).

"attorneys for the government in the performance of their duties," FED. R. CRIM. P. 6(e), 18
U.S.C. § 687 app. at 1963 (1946).  Federal Rule of Criminal Procedure 54(c) defined "attorneys
for the government," as that phrase was used in Rule 6(e), narrowly, to include only the Attorney
General, assistants to the Attorney General, United States Attorneys, and assistants to United
States Attorneys.  FED. R. CRIM. P. 54(c), 18 U.S.C. § 687 app. at 1987 (1946).  "This became
something of a problem in practice, because Justice Department attorneys found that they often
needed active assistance from outside personnel," *Sells Eng'g*, 463 U.S. at 436, in particular,
"attorneys for government agencies outside the Justice Department," *id.* at 436 n.21.

To address this growing concern, after several years of deliberation by the Advisory
Committee on Criminal Rules, the Committee on Rules of Practice and Procedure, and the
Judicial Conference as a whole, in 1976, the Supreme Court approved and transmitted to
Congress proposed amendments to Rule 6(e).  *See Amendments to Federal Rules of Criminal
Procedure* ("*1976 Proposed Amendments*"), 425 U.S. 1157 (1976); *Proposed Amendments to the
Federal Rules of Criminal Procedure: Hearings Before the Subcomm. on Crim. Justice of the H.
Comm. on the Judiciary*, 95th Cong. 105 (1977) [hereinafter *1977 Hearings*] (statement of Prof.
Wayne R. LaFave, Reporter, Advisory Comm. on Crim. Rules); *Communication from the Chief
Justice of U.S. Transmitting Amendments to the Federal Rules of Criminal Procedure*, H.R. DOC.
NO. 94-464, at iii–iv (1976).

The Supreme Court's version of the 1976 amendments included a proposal "to add one
sentence to Rule 6(e), immediately following the provision for disclosure to attorneys for the
Government."  *Sells Eng'g*, 463 U.S. at 436–37.  That sentence would have stated that "[f]or
purposes of [Rule 6(e)], 'attorneys for the government' includes those enumerated in Rule 54(c);
it also includes such other government personnel as are necessary to assist the attorneys for the

government in the performance of their duties." *1976 Proposed Amendments*, 425 U.S. at 1161; *see also* H.R. DOC. NO. 94-464, app. A, at 7.[10]  The Advisory Committee's Notes on this suggested change to Rule 6(e) explained that the expanded definition of "attorneys for the government" was "designed to facilitate an increasing need, on the part of government attorneys, to make use of outside expertise in complex litigation" and clarified that "[t]he phrase 'other government personnel'" in the definition "includes, but is not limited to, employees of administrative agencies and government departments." FED. R. CRIM. P. 6(e) advisory committee's note to 1977 amendment.

"The proposed amendment to Rule 6(e) met a mixed reception in Congress." *Sells Eng'g*, 463 U.S. at 437.  Concerned about the potential expansion of grand jury disclosure, Congress postponed the effective date of the amendment to Rule 6(e) until the earlier of August 1, 1977 or its approval by Congress to allow for review of the proposal.  Act of July 8, 1976, Pub. L. No. 94-349, § 1, 90 Stat. 822; *see also 1977 Hearings*, *supra*, at 1 (remarks of Rep. Mann).  The House Subcommittee on Criminal Justice held hearings on the proposed amendments, *see 1977 Hearings*, *supra*, and ultimately recommended that the House reject the modification to Rule 6(e).  In its report, the Subcommittee expressed "concern that [the revised Rule 6(e)] would permit too broad an exception to the rule of keeping grand jury proceedings secret" and "would allow Government agency personnel to obtain grand jury information which they could later use in connection with an unrelated civil or criminal case." H.R. REP. NO. 95-195, at 4 (1977).  "The House [subsequently] voted to disapprove the amendment." *Sells Eng'g*, 463 U.S. at 437; *see also* H.R. 5864, 95th Cong. § 2 (1977).

---

[10]     The proposed amendments also included technical changes to Rule 6(e) not relevant here.  *See 1976 Proposed Amendments*, 425 U.S. at 1161–62.

Following the House's rejection of the proposed amendment to Rule 6(e), *see* 123 Cong. Rec. 25,194 (1977) (remarks of Rep. Mann), the Senate Judiciary Committee began the process of "redraft[ing] Rule 6(e) to accommodate both the purpose of the proposed amendment and the concerns of the House," *Sells Eng'g*, 463 U.S. at 438; *see also* S. Rep. No. 95-354, at 1–2, 5–8 (1977).  In consultation with the House Subcommittee on Criminal Justice, the Senate Subcommittee on Criminal Laws and Procedures wrote a revised amendment to Rule 6(e), *see* 123 Cong. Rec. H7,866 (daily ed. July 27, 1977) (statement of Rep. Mann), which was passed by Congress, Act of July 30, 1977 § 2(a).  The version of the Rule that was ultimately enacted stated, in relevant part, that "[d]isclosure otherwise prohibited by this rule of matters occurring before the grand jury . . . may be made to . . . (ii) such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce Federal criminal law."  *Id.*; *see also* 123 Cong. Rec. H7,865 (daily ed. July 27, 1977).

Congress did not define the term "government personnel" in the final language of Rule 6(e)(3)(A)(ii).  It did, however, decline to include in the final Rule the phrase "other government personnel," which had featured in the Supreme Court's proposed amendment to Rule 6(e), *see 1976 Proposed Amendments*, 425 U.S. at 1161, and was explicitly defined by the Advisory Committee as "includ[ing], *but not limited to*, employees of administrative agencies and government departments," Fed. R. Crim. P. 6(e) advisory committee's note to 1977 amendment (emphasis added).  Congress's rejection of the Supreme Court's specific phrase suggests a rejection also of the Advisory Committee's broad definition of that term in favor of a narrower construction that did indeed limit disclosure to government employees rather than being "not limited to" them.  This logic aligns with the concerns about expanding too far the availability of

disclosure and preserving grand jury secrecy that led the House to disapprove of the amendments as initially proposed.  Additional details of the legislative history of the 1977 amendments only confirms this inference.

First, the testimony given at the House Subcommittee's hearings on the proposed amendments indicates that Congress understood the term "government personnel" to be synonymous to "government employee."  Professor Wayne LaFave, the Reporter to the Advisory Committee on Criminal Rules, directly answered the question of whether the proposed amendment would allow to disclosure to individuals outside the government.  *See 1977 Hearings*, *supra*, at 92 (testimony of Prof. LaFave).  When asked whether the "intention" of the proposed rule was "not to permit the prosecutor to call in an astrologer or astronomer, for example," if no "governmental employee [was] expert in that field," Professor LaFave responded: "Yes; that is correct.  Apparently representatives of the Justice Department . . . did not seem to think that was a problem, in other words, that there was an occasion when they would need an expert and couldn't find the astrologer some place in the Federal Government." *Id.*  Elsewhere in the hearings, the term "government personnel" is treated as equivalent to the term "government employee."[11]

Likewise, the House and Senate reports on the various proposed amendments to Rule 6(e) appear to use the terms "government personnel" and "government employees" interchangeably. *See* S. REP. NO. 95-354, at 6 (stating, in explaining the final version of Rule 6(e), that

---

[11]     *See, e.g.*, *1977 Hearings*, *supra*, at 86 (testimony of Prof. LaFave) ("The purpose of this added sentence is to make it clear that rule 6(e) does not forbid U.S. attorneys from making use of this expertise from other Government employees when that outside expertise is, in fact, necessary for the U.S. attorney to carry out his duties."); *id.* at 158 (testimony of Mr. Nussbaum) (suggesting that an exception for government personnel would lead to "access by the entire Federal bureaucracy to grand jury testimony and documents"); *id.* at 29 (testimony of Judge Becker) (discussing concerns related to the proposed disclosure of grand jury matters to employees of agencies other than the Department of Justice, for example, the Internal Revenue Service ("IRS") or the Securities and Exchange Commission ("SEC")); *In re Grand Jury Proc.*, 158 F. Supp. 2d at 110–11 (cataloguing additional examples).

"[a]ttorneys for the Government in the performance of their duties with a grand jury must possess the authority to utilize the services of other government employees"); H.R. REP. NO. 95-195, at 13 (view of Rep. Wiggins) (noting that the proposed amendment "attempt[s] to make it clear that Attorneys for the Government in the performance of their duties with a grand jury, possess the authority to utilize the services of other government employees"). The consistent treatment by Congress of these terms as synonymous suggests that Congress understood "government personnel" to refer to "government employees."

Second, the history makes apparent that Congress's overriding interest when amending Rule 6(e) was in preserving grand jury secrecy to the greatest extent possible while enabling prosecutors to seek necessary aid, within carefully circumscribed limitations. Notably, the Supreme Court's proposed amendment to Rule 6(e) placed no subject-matter restriction on the use of grand jury materials by "government personnel," aside from the requirement that disclosure be "necessary to assist the attorneys for the government in the performance of their duties." *1976 Proposed Amendments*, 425 U.S. at 1161. Congress apparently found this limit inadequate, and added to the final version of Rule 6(e)(3)(A)(ii) the further qualification that the "government personnel" be "necessary . . . to assist . . . in the performance of such attorney's duty to enforce Federal criminal law." Act of July 30, 1977 § 2(a); *see also* S. REP. NO. 95-354, at 8 ("The Rule as redrafted is designed to accommodate the belief on the one hand that Federal prosecutors should be able . . . to make such disclosures of grand jury information to other government personnel as they deem necessary to facilitate the performance of their duties relating to criminal law enforcement. On the other hand, the Rule seeks to allay the concerns of those who fear that such prosecutorial power will lead to misuse of the grand jury to enforce non-criminal Federal laws[.]"). The congressionally imposed restriction of disclosure not just to

government personnel, but only to government personnel needed to assist in the enforcement of federal criminal law clearly indicates that Congress sought to tailor narrowly the availability of disclosure under Rule 6(e)(3)(A)(ii) even within the government.  This careful legislative effort to curb unnecessary intragovernmental disclosure makes highly unlikely that Congress intended to allow disclosure to private entities and individuals outside the government.

Finally, Congress, the Supreme Court, and the Advisory Committee all understood the proposed amendments to Rule 6(e) as an attempt to codify a growing body of case law allowing disclosure of grand jury matters to federal government employees outside the Department of Justice.  *See* S. REP. NO. 95-354, at 7 (noting that "it is timely to redraft subdivision (e) of Rule 6" to reconcile "the anomalous language of Rule 6(e) itself" with "current practice, and the weight of case law"); H.R. DOC. NO. 94-464, at 9 ("Although case law is limited, the trend seems to be in the direction of allowing disclosure to government personnel who assist attorneys for the government in situations where their expertise is required."); FED. R. CRIM. P. 6(e) advisory committee's note to 1977 amendment (same).  The cases cited by these entities in their respective descriptions of the proposed amendment, *see 1977 Hearings*, *supra*, at 106 (testimony of Prof. LaFave); FED. R. CRIM. P. 6(e) advisory committee's note to 1977 amendment; H.R. DOC. NO. 94-464, at 9; S. REP. NO. 95-354, at 6–7, 7 n.9, all examined the question of whether the pre-1977 version of Rule 6 permitted disclosure by prosecutors to other government agencies and employees, not to private entities or individuals.[12]

---

[12]     *See, e.g.*, *United States v. Evans*, 526 F.2d 701, 707 (5th Cir. 1976) (allowing disclosure "to a special agent from the Treasury Department in the Alcohol, Tobacco and Firearms Bureau"); *In re Apr. 1956 Term Grand Jury*, 239 F.2d 263, 272–73 (7th Cir. 1956) (considering disclosure to the Treasury Department); *United States v. U.S. Dist. Ct.*, 238 F.2d 713, 721 (4th Cir. 1956) (allowing disclosure to prosecutors' "superiors in the Department of Justice"); *Robert Hawthorne, Inc. v. Dir. of Internal Revenue*, 406 F. Supp. 1098, 1120–28 (E.D. Pa. 1975) (permitting disclosure to "agents, special agents, and employees of the I.R.S.," *id.* at 1120); *In re William H. Pflaumer & Sons, Inc.*, 53 F.R.D. 464, 475 (E.D. Pa. 1971) ("[R]epresentatives of government agencies actively assisting the United States Attorney in a grand jury investigation and working under his direction and control may have access to the grand jury material for such purpose."); *United States v. Anzelmo*, 319 F. Supp. 1106, 1116 (E.D.

Indeed, the Senate Judiciary Committee, in explaining the background against which Congress amended Rule 6(e), stated that, while "[t]he parameters of the authority of an attorney for the government to disclose grand jury information in the course of performing his own duties" were unclear under the then–current version of the Rule, in practice and in case law, "a commonsense interpretation prevail[ed], permitting 'Representatives of other government agencies actively assisting United States attorneys in a grand jury investigation . . . access to grand jury material in the performance of their duties.'"  S. REP. NO. 95-354, at 6–7 (omission in original) (quoting *United States v. Evans*, 526 F.2d 701, 707 (5th Cir. 1976)).  Given the express interest of the drafting bodies in adapting the Rule to reflect the current state of the case law and practice, "[i]t is reasonable to infer . . . that use of 'government personnel' in the proposed amendment [to Rule 6(e)] was designed to mirror this limitation in the case law," and therefore to permit disclosure only to non-attorney government employees and government attorneys outside the Department of Justice.  *In re Grand Jury Proc.*, 158 F. Supp. 2d at 112.

The legislative history of the 1977 amendments to Rule 6(e), which introduced the term "government personnel" in Rule 6(e)(3)(A)(ii), thus indicates that Congress intended to permit disclosure of grand jury matters only to government employees, and only in limited circumstances when effective enforcement of federal criminal law required the assistance of additional government employees.  Examination of subsequent amendments to the Rule, expanding the reach of "government personnel" to include employees of state and local governments, Indian tribes, and foreign governments, further confirms this analysis.

_____

La. 1970) (approving disclosure to an "attorney" and an "accountant for the SEC"); *United States v. Culver*, 224 F. Supp. 419, 432 (D. Md. 1963) (finding disclosure to "a postal inspector" proper); *In re Kelly*, 19 F.R.D. 269, 270 (S.D.N.Y. 1956) (authorizing disclosure to "members of [the U.S. Attorney's] staff, and accountants of the [FBI] and [IRS]").

### b.    Subsequent Amendments

After the (A)(ii) exception was adopted by Congress in 1977, courts applying the new

Rule 6(e) began to "differ[] over whether employees of state and local governments [were]

'government personnel' within the meaning of the [exception]."  FED. R. CRIM. P. 6(e) advisory

committee's note to 1985 amendment (citing *In re Miami Fed. Grand Jury No. 79-8*, 478 F.

Supp. 490 (S.D. Fla. 1979); *In re Grand Jury Proc.*, 445 F. Supp. 349 (D.R.I. 1978); *In re 1979*

*Grand Jury Proc.*, 479 F. Supp. 93 (E.D.N.Y. 1979)).  To address this emerging divide, in 1985,

the Supreme Court transmitted to Congress a proposed amendment to Rule 6(e) that, in relevant

part, clarified that "[d]isclosure . . . may be made to . . . government personnel (including

personnel of a state or subdivision of a state)."  *1985 Amendments*, 471 U.S. at 1171; *see also*

H.R. DOC. NO. 99-64, at 2.  The amendment took effect on August 1, 1985, without any revision

by Congress.  *See* FED. R. CRIM. P. 6(e) notes.

The Advisory Committee's explanation of this amendment to the (A)(ii) exception

suggests that the 1977 version of the exception did not allow for disclosure to state and local

government employees.  The Committee noted that some federal courts read the term

"government personnel," standing alone, to refer only to employees of the federal government,

and that "[t]he amendment," not the Rule in its previous form, unambiguously "permits

disclosure to [state and local] personnel."  FED. R. CRIM. P. 6(e) advisory committee's note to

1985 amendment.  This account of the 1985 amendment indicates that the term "government

personnel," standing alone, in fact was intended to include only federal government employees,

necessitating the explicit addition of state and local government personnel to the Rule.  Indeed,

the 1985 amendment would have been superfluous had "government personnel" included any

individuals, whether federal government employees or not, whose help was necessary to federal

prosecutors' enforcement of federal law.  It would strain credulity to read the term "government personnel," as the government suggests, to include private entities when both the Advisory Committee and a number of reviewing courts understood it to exclude even the personnel of non-federal governmental entities.  Moreover, the Advisory Committee emphasized the status of "employees of state and local governments" as compared to federal employees, again implying that the Committee saw the words "employee" and "personnel" as interchangeable.  *Id.*

Just as crucially, though the 1985 amendment expanded the covered "government personnel" beyond federal government employees, that expansion was deliberately limited only to the employees of other governmental entities.  Likewise, the 2002 and 2004 amendments to Rule 6(e)(3)(A)(ii) added Indian tribes and foreign governments, respectively, to the list of the public entities whose personnel fall within the scope of the exception, but made no mention of private entities.  *See 2002 Amendments*, 535 U.S. at 1186; FED. R. CRIM. P. 6(e) advisory committee's note to 2002 amendment (explaining that the revised (A)(ii) exception "includes a new provision recognizing the sovereignty of Indian Tribes and the possibility that it would be necessary to disclose grand-jury information to appropriate tribal officials in order to enforce federal law"); 2004 Amendment § 6501(a)(1)(A) (modifying Rule 6(e)(3)(A)(ii) to allow disclosure to personnel of a "foreign government," in addition to "a state or state subdivision, [or] Indian tribe").  All three amendments identify additional governmental bodies to whom disclosures may be made when necessary, but still confine the reach of the (A)(ii) exception only to public entities.  Neither the Supreme Court nor Congress, in these or any other amendments to Rule 6(e), has sought to move beyond permitting disclosure to the personnel of governmental bodies by including private entities and their employees in the (A)(ii) exception, despite repeated opportunities to do so.  The clear implication of this pattern is that, while "government

personnel" may be employed by any of the federal and non-federal governments enumerated in the Rule, covered individuals must share the essential characteristic of being employed by a public governmental entity.

In sum, this consistent trend from 1977 to 2004 of increasingly allowing disclosure to the personnel of governmental entities while omitting from the text of Rule 6(e)(3)(A)(ii) any reference to private or contracted entities confirms that the "government personnel" covered by the exception are the employees of public governmental entities expressly identified in the text of the Rule.  Though some leeway may exist to recognize personnel of other public governmental entities not explicitly enumerated, mindful of *McKeever*'s caution that the contours of exceptions to the general rule of grand jury secrecy are defined by Congress and the Supreme Court in its rulemaking capacity, *see* 920 F.3d at 845; *In re Appl.*, 2019 WL 4619698, at *4, the legislative history provides no basis to infer that employees of private entities may be included.  *See Andrus*, 446 U.S. at 616–17 ("[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."); *McKeever*, 920 F.3d at 845 (quoting *Andrus* approvingly in the Rule 6(e) context).

### 4. *Precedent*

Unsurprisingly, since both the text and the legislative history of Rule 6(e)(3)(A)(ii) counsel against a broad reading of "government personnel" to include outside contractors, the government supports its argument in favor of such an interpretation primarily through reliance on decisions of the First, Second, and Tenth Circuits "recogniz[ing] that contract employees may be considered 'government personnel' for purposes of Rule 6(e)(3)(A)(ii) when those employees perform necessary prosecutorial functions under government control."  Gov't's Mot. at 6; *see*

*also id.* at 6–7 (citing *United States v. Pimental*, 380 F.3d 575, 578–79, 596 (1st Cir. 2004);

*United States v. Lartey*, 716 F.2d 955, 964 (2d Cir. 1983); *United States v. Anderson*, 778 F.2d

602, 605 (10th Cir. 1985)); Gov't's Suppl. Mem. at 2–3.[13]  This reliance on nonbinding case law

is unpersuasive for several reasons.

First, the First, Second, and Tenth Circuits have not adopted the same framework for

interpreting Rule 6(e) set out by the D.C. Circuit in *McKeever* and therefore are not bound by

either the conclusion that the text of Rule 6(e)(3) must be narrowly and literally construed or the

determination that Rule 6(e)(3)'s exceptions represent an exhaustive list of the available

exceptions to grand jury secrecy.  *See, e.g.*, *Pimental*, 380 F.3d at 594 (determining that, because

"the text of the [sic] Rule 6(e)(3)(A)(ii) itself provides little guidance," the court should "turn to

the history of the Rule and its purpose in allowing disclosure only to 'government personnel'");

*In re Craig*, 131 F.3d 99, 102 (2d Cir. 1997) ("Although, by delimiting the exceptions to grand

jury secrecy, Rule 6(e)(3) governs almost all requests for the release of grand jury records, this

court has recognized that there are certain 'special circumstances' in which release of grand jury

records is appropriate even outside of the boundaries of the rule." (citing *In re Biaggi*, 478 F.2d

489, 494 (2d Cir. 1973))); *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1178 (10th Cir. 2006)

(acknowledging that district courts may have inherent authority to disclose grand jury materials

---

[13]     The government cites for the first time in its second supplemental memorandum, and does not ever cite in
its arguments regarding Rule 6(e)(3)(A)(ii), *United States v. Sells Engineering, Inc.*, 463 U.S. 418 (1983), a case in
which the Supreme Court addressed the question of when grand jury matters may be disclosed to civil attorneys
within the Department of Justice for the purpose of pursuing civil suits.  *Id.* at 420; *see* Gov't's Second Suppl. Mem.
at 3, 4, 5 n.1, 9–10.  The *Sells* Court, in recounting the legislative history of Rule 6(e), noted that the (A)(ii)
exception for government personnel was designed to accommodate Justice Department attorneys' need for "active
assistance from outside personnel—not only investigators from the FBI, IRS, and other law enforcement agencies,
but also accountants, handwriting experts, and other persons with special skills."  *Sells Eng'g*, 463 U.S. at 436.
Though this dictum appears at first glance to support the government's broad interpretation of "government
personnel," closer scrutiny reveals that the Supreme Court understood the "outside personnel" at issue to consistent
of "agencies outside the Department of Justice" and "employees of outside agencies, such as the IRS."  *Id.* at 438;
*see also In re Grand Jury Proc.*, 158 F. Supp. 2d at 104–05.

beyond the non-exhaustive exceptions enumerated in Rule 6(e) but declining to define the scope

of that authority).  These courts, then, were not obligated to construe Rule 6(e)(3)(A)(ii) as a

narrow and exclusive exception to grand jury secrecy, as *McKeever* requires this Court to do.

Nor were they required to treat the text of Rule 6(e)(3)(A)(ii) strictly, leaving them free to assign

greater weight to the purpose of the disclosure at issue in construing its language, as the

government urges here.

Second, contrary to the government's characterization, the cases on which it relies do not

unambiguously hold that independent contractors providing services to the government are

"government personnel" within the meaning of Rule 6(e)(3)(A)(ii) and are distinguishable on

their facts.  For example, the First Circuit in *United States v. Pimental*, 380 F.3d 575 (1st Cir.

2004), held that certain employees of the Massachusetts Insurance Fraud Bureau, "a 'quasi-

governmental entity[]' that investigates allegations of fraudulent insurance transactions," *id.* at

592 (quoting *In re Justices of Superior Ct.*, 218 F.3d 11, 13 (1st Cir. 2000)), were "government

personnel," *id.* at 596–97.  This conclusion, however, rested on the role of state statutes in

creating, mandating private funding for, and determining the "purpose, organizational scheme,

and basis operations" of the Bureau; the statutory directive that a certain number of board

members be public officials; and "the constant oversight" of the Bureau by "the Massachusetts

legislature." *Id.* at 593; *see also id.* at 592–93.  These factors led the First Circuit to determine

that the Bureau "straddle[d] the line between a government and a private entity." *Id.* at 594.

Analogizing Bureau investigators to state law enforcement personnel, the court relied on the

exception's purpose of "facilitat[ing] cooperation between federal prosecutors and state

personnel . . . in the investigation and prosecution of federal criminal cases" and Congress's

"conscious decision" in enacting the text of Rule 6(e)(3)(A)(ii) "to entrust certain state, as well

as federal, personnel with information concerning matters before a grand jury," *id.* at 595, to conclude "that the exception in Rule 6(e)(3)(A)(ii) may cover the unique quasi-governmental investigators of the [Bureau]," *id.* at 596.

*Pimental* therefore does not support the government's position, that an independent contractor and its employees may be deemed "government personnel" upon "'a functional showing' that such contractors fall within the ambit of Rule 6(e)(3)(A)(ii)."  Gov't Mot. at 7 (quoting *Pimental*, 380 F.3d at 596).  It stands instead for the more limited proposition that "the prosecutor must seek court authorization [for disclosure] where quasi-governmental agencies . . . are involved" and may "make a functional showing" that individual employees of quasi-governmental entities fall within the scope of the exception.  *Pimental*, 380 F.3d at 596.  A "functional showing" standard of this sort is, of course, foreclosed in this Circuit by *McKeever*'s requirement that district courts "hew strictly" to the text of Rule 6(e)(3)'s exceptions.  920 F.3d at 846; *see supra* Part III.A.1.

In any event, none of the considerations that favored disclosure in *Pimental* apply to support a "functional showing" that Deloitte and its employees fall within the scope of the (A)(ii) exception.  The special relationship between federal and state law enforcement and the explicit recognition of that relationship in the text of (A)(ii) do not support extension of the term "government personnel" to include an outside contractor retained by the government.  Nor is Deloitte, as a private firm subject to government oversight only within the parameters of performing a particular contract, analogous to the quasi-governmental Bureau, which was subject to extensive state-government control under statute.  *See In re Grand Jury Matter*, 607 F. Supp. 2d 273, 275–76 (D. Mass. 2009) (determining that "a private contractor" was not "a quasi-governmental entity as in *Pimental*" and therefore "d[id] not qualify as government personnel"

under the logic of that decision (internal quotation marks omitted)).  *Pimental*, then, does not

undercut the statutory interpretation outlined above of the term "government personnel" as

excluding private entities and these entities' employees.

The government's reliance on *United States v. Anderson*, 778 F.2d 602 (10th Cir. 1985),

is similarly misplaced.  The Tenth Circuit in that case found that disclosure to a trust law expert

retained "under contract with the government" of "certain promotional materials promulgated to

the general public by the defendants," which materials had also been presented to the grand jury,

did not violate Rule 6(e).  *Id.* at 605.  The court, however, did not explicitly find either that the

expert was "government personnel" or that the challenged disclosure involved a "matter

occurring before the grand jury," noting instead that "'documents are not cloaked with secrecy

merely because they are presented to a grand jury.'"  *Id.* (quoting *Lartey*, 716 F.2d at 964); *see

also United States v. Pac. Gas & Elec. Co.*, Case No. 14-cr-00175-TEH, 2016 WL 3255069, at

*2 (N.D. Cal. June 14, 2016) (interpreting the *Anderson* Court's analysis as turning on whether

the material disclosed is "non-public").  *Anderson* therefore leaves ambiguous, at best, whether

the government needed to invoke or appropriately invoked the (A)(ii) exception to justify

disclosure.[14]

Nor does *United States v. Lartey*, 716 F.2d 955 (2d Cir. 1983), support the government's

interpretation of (A)(ii) or the application of that interpretation to treat Deloitte as "government

personnel."  The Second Circuit in *Lartey* determined that "a recently retired Internal Revenue

---

[14]     In addition, before deciding *Anderson*, the Tenth Circuit held in *United States v. Tager*, 638 F.2d 167 (10th Cir. 1980), that "by limiting (A)(ii) to 'government personnel,'" "the drafters of (A)(ii) considered whether the assistance of private persons . . . should be included" in the exception and "decided against such inclusion," *id.* at 170 (finding that an investigator employed by a private organization who referred a case to the United States Postal Inspection Service did not qualify as "government personnel").  This conclusion remains good law even after *Anderson*, which explicitly observed that "[t]he facts in *Tager* [were] far different" than the facts allowing disclosure in *Anderson*, 778 F.2d at 605, and undermines the government's contention that "all U.S. Courts of Appeals to consider the question have found that the term 'government personnel' is not limited to permanent or full-time federal employees," Gov't's Suppl. Mem. at 2.

Service agent" retained by the government "to analyze [the defendant's] finances" qualified as "government personnel." *Id.* at 960.  This decision, however, relied heavily on the specific circumstances of the agent's retention.  "During the period that [the agent] had access to [grand jury materials], he was employed exclusively by the government." *Id.* at 963.  In addition, "[t]he records were kept in a secure location in the United States Attorney's office, and [the agent] did not discuss them with anyone other than" the prosecutor and law enforcement agents working on the investigation.  *Id.*  These facts allowed the Second Circuit to conclude that the agent was employed, not merely contracted, by the government at the time of the disclosure.  Since "nothing in the legislative history of the 1977 amendments . . . indicate[d] that the term ['government personnel'] is limited to permanent civil service employees of the United States," disclosure to a temporary employee was within the scope of the exception, *id.* at 964, but the court did not reach beyond temporary government employees to the question of whether private entities can be classified as "government personnel."

   *Lartey*'s logic thus does not readily extend to a private international firm like Deloitte that simultaneously holds multiple contracts with private and public entities across the globe and cannot be considered a government "employee" in any meaningful sense.  The government is one of many Deloitte clients, not its exclusive employer.  In addition, by the government's own admission, the grand jury materials it seeks to disclose would "reside[] in the Deloitte hosting environment" or at a "secure facility" managed by Deloitte, not on a government-controlled server or at a government-owned facility.  Gov't Mot. at 5; *see also* Gov't Suppl. Mem. at 3– 4.  Deloitte employees' access to potentially protected data would be controlled by Deloitte, not the government.  Under these circumstances, *Lartey*'s reasoning does not stretch far enough to bring Deloitte and its employees within the scope of the term "government personnel."  *See, e.g.*,

*Pac. Gas & Elec. Co.*, 2016 WL 3255069, at *2 (finding disclosure of information to "private consultants who do not work for government or quasi-governmental entities, who were not exclusively working for the government on this case, and whose access to data was not controlled by the government" distinguishable from *Lartey* and non-exempt under Rule 6(e)(3)(A)(ii)); *In re Grand Jury Proc.*, 158 F. Supp. 2d at 117 ("*Lartey* did read (A)(ii) expansively as not requiring a *permanent* employment relationship, but it did not entirely read out the requirement that some employment relationship exist.").[15]

Though the case law interpreting "government personnel" in Rule 6(e)(3)(A)(ii) is sparse, beyond these unpersuasive and distinguishable circuit decisions relied on by the government, a number of district courts have held that (A)(ii) does not allow disclosure to private individuals retained by the government. *See, e.g.*, *Pac. Gas & Elec. Co.*, 2016 WL 3255069, at *2; *In re Grand Jury Matter*, 607 F. Supp. 2d at 275–77; *In re Nov. 1992 Special Grand Jury*, 836 F. Supp. 615, 617–18 (N.D. Ind. 1993) (finding that neither Rule 6(e)(3)(A)(ii) nor the exception now codified at Rule 6(e)(3)(E)(i) permits disclosure to private auditors); *In re Disclosure of*

---

[15]     *In re Disclosure of Matters Occurring Before Grand Jury to Litigation Technology Service Center* ("*LTSC Disclosure Decision*"), Misc. No. 11-00163 JMS/RLP, 2011 WL 3837277 (D. Haw. Aug. 25, 2011), another nonbinding, out-of-circuit case cited by the government, *see* Gov't's Suppl. Mem. at 2–3, is similarly distinguishable.  That decision determined that the term "'government personnel' is not restricted to full-time permanent government employees" and that the availability of the (A)(ii) exception "must be guided by the particular circumstances of the entity at issue and the need for disclosure."  *LTSC Disclosure Decision*, 2011 WL 3837277, at *3.  This flexible interpretation of Rule 6(e)(3)(A)(ii) is unavailable in this Circuit under *McKeever*.  *See supra* Part III.A.1.  In addition, although the *LTSC Disclosure Decision*, as the government claims, "permitt[ed] disclosure of grand jury materials to private contractor personnel who operate the Litigation Technology Service Center ('LTSC')," Gov't's Suppl. Mem. at 2–3; *see LTSC Disclosure Decision*, 2011 WL 3837277, at *3–4, as the government notes, the LTSC is a "federally-owned facility," Gov't's Suppl. Mem. at 3, whose "data is maintained within a secure Department of Justice information technology infrastructure" and whose "operations are performed in a secure government-owned building," *LTSC Disclosure Decision*, 2011 WL 3837277, at *3.  The government "ultimately control[s] the handling of all case data and documents" at the LTSC.  *Id.*  Thus, while the "LTSC is operated by" private contractor personnel, the court found that "in all other respects [the] LTSC appears to have the characteristics of a governmental entity."  *Id.*  Deloitte, in contrast, shares none of these operative characteristics of governmental entities, aside from fact that its personnel are "required to adhere to all . . . applicable laws, regulations, and Department of Justice policies and procedures."  Gov't's Mot. at 5; *see LTSC Disclosure Decision*, 2011 WL 3837277, at *3 ("LTSC employees are subject to all laws, regulations, and Department of Justice policies that are imposed on U.S. Attorney's Office employees[.]").  This precaution alone is not sufficient to qualify Deloitte for treatment as a governmental entity.

*Grand Jury Material*, 645 F. Supp. 76, 79 (N.D. W. Va. 1986) (same); *United States v. Hogan*, 489 F. Supp. 1035, 1038 (W.D. Wash. 1980) ("It is clear that the government personnel addressed in Rule 6(e)(3)(A)(ii) are the Government agents who gather and present information relating to criminal behavior to prosecutors who analyze and evaluate it and present it to grand juries." (internal quotation marks and citations omitted)).

In light of the text and history of Rule 6(e)(3)(A)(ii), as well as the limitations imposed on interpretation of Rule 6(e) in this Circuit by *McKeever*, the term "government personnel" is best construed, in accord with the bulk of the district court case law, as including only employees of public governmental entities. Deloitte, a private firm contracted by the government on a non-exclusive basis, is a private rather than a public governmental entity, and its staff are employees of the firm rather than the government. Rule 6(e)(3)(A)(ii) thus does not allow disclosure of grand jury matters to Deloitte and its employees.

## B. Disclosure Under Rule 6(e)(3)(E)(i)

In a last-gasp attempt to demonstrate that potentially massive disclosure of grand jury materials to Deloitte, a private contractor, is appropriate, the government seeks for the first time in its second supplemental memorandum "a disclosure order . . . under Rule 6(e)(3)(E)(i)." Gov't's Second Suppl. Mem. at 1.[16]  In contrast to the exception the government first relied on in

---

[16]     The government notes that the "Court may exercise its discretion to authorize disclosure under Rule 6(e)(3)(E)(i) regardless of whether it agrees with the government's primary submission that disclosure to Deloitte is permissible under the government-personnel exception in Rule 6(e)(3)(A)(ii)," Gov't's Second Suppl. Mem. at 7, but observes that "[s]ome out-of-circuit decisions have taken a different view," *id.* at 8.  The cases it cites in support of this proposition disapproved of disclosure under Rule 6(e)(3)(E)(i) to private parties that also fell outside the coverage of "government personnel" in (A)(ii).  *Id.* at 8–9 (citing *Tager*, 638 F.2d at 170; *In re Nov. 1992 Special Grand Jury*, 836 F. Supp. at 617–18; *In re Disclosure of Grand Jury Material*, 645 F. Supp. at 79).  The reasoning in these cases, however, was not related to the parties' status as non-government personnel, but instead to the conclusion that a request for disclosure of grand jury materials for use in "the [same] ongoing grand jury investigation" in which the materials were collected falls outside of the exception.  *Tager*, 638 F.2d at 170; *see also In re Nov. 1992 Special Grand Jury*, 836 F. Supp. at 618 ("[Rule 6(e)(3)(E)(i)] authorizes district courts to disclose grand jury materials only where those materials are necessary to an altogether different proceeding."); *In re Disclosure of Grand Jury Material*, 645 F. Supp. at 78 ("The Grand Jury proceeding from which disclosure is desired is not the 'judicial proceeding' contemplated by the Rule.").

Rule 6(e)(3)(A)(ii), *see supra* note 7, the exception in Rule 6(e)(3)(E)(i) requires judicial authorization in the form of a court order.  Specifically, the (E)(i) exception provides that a "court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter: (i) preliminarily to or in connection with a judicial proceeding."  FED. R. CRIM. P. 6(e)(3)(E).  Disclosure of grand jury information is proper under this exception when three requirements are satisfied.  The person seeking disclosure must first identify a relevant "judicial proceeding" within the meaning of Rule 6(e)(3)(E)(i); then, second, establish that the requested disclosure is "preliminarily to" or "in connection with" that proceeding; and, finally, show a "particularized need" for the requested grand jury materials. *Sells Eng'g*, 463 U.S. at 443 ("Rule [6(e)(3)(E)(i)] simply authorizes a court to order disclosure 'preliminarily to or in connection with a judicial proceeding.' . . . We have consistently construed the Rule, however, to require a strong showing of particularized need for grand jury materials before any disclosure will be permitted."); *United States v. Baggot*, 463 U.S. 476, 479–80 (1983) (explaining that the "preliminarily to or in connection with a judicial proceeding" and the "particularized need" requirements "are independent prerequisites to [(E)(i)] disclosure" (internal quotation marks omitted)).

The government contends that its request to disclose to Deloitte all grand jury materials from hundreds of Capitol attack cases already pending and those still being investigated meets the requirements for disclosure under Rule 6(e)(3)(E)(i) because "[t]he disclosures at issue . . . would assist the parties to criminal cases in the preparation or conduct of possible criminal trials, which are 'judicial proceeding[s]' under the Rule."  Gov't's Second Suppl. Mem. at 1 (second alteration in original).  It further argues that "[t]he government . . . has a particularized need to disclose the materials to Deloitte, a trusted contractor whose specialized tools will help the

government systematically review all of the materials that are (or may be) subject to the protections of Rule 6(e) and thus ensure that hundreds of defendants charged (and still to be charged) in the Capitol Breach prosecutions have timely and secure access to the materials to which they are entitled." *Id.* at 1–2.  As explained below, this effort to satisfy the parameters of Rule 6(e)(3)(E)(i) overlooks the novelty and the breadth of the government's instant request.  In light of these factors, the government has failed to show a particularized need for the blanket disclosure of grand jury materials to Deloitte and therefore cannot obtain authorization for such disclosure under (E)(i).

### 1.  *"Preliminarily to or in Connection with a Judicial Proceeding"*

The government contends that the first and second prongs of the (E)(i) test are met because it seeks to disclose information to Deloitte as part of its own preparation for eventual trials in the Capitol attack cases and to provide necessary discovery for defendants' preparation for those trials.  A "possible criminal trial" is, of course, "a judicial proceeding" within the meaning of the Rule.  *In re Grand Jury*, 490 F.3d 978, 986 (D.C. Cir. 2007) (per curiam) (citing *United States v. Mayes*, 670 F.2d 126, 129 (9th Cir. 1982)).  Disclosure under Rule 6(e)(3)(E)(i) is, however, generally authorized only to permit the sharing of grand jury materials preliminarily to or in connection with a *single* other judicial proceeding, rather than all cases—numbering here in the hundreds—arising from a massive investigation.  This restriction of the disclosure available under (E)(i) to the disclosure necessary to one judicial proceeding for which a further showing of particularized need is made accords with both the text of the exception, providing for disclosure of grand jury matters related to "*a* judicial proceeding," FED. R. CRIM. P. 6(e)(3)(E)(i) (emphasis added); *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481–82 (2021) (finding that "[n]ormally, indefinite articles (like 'a' or 'an') precede *countable* nouns" and therefore

indicate a "singular" quantity (emphasis in original)), and the exception's goal of ensuring that, even where disclosure is allowed, the veil of grand jury secrecy is lifted only "discretely and limitedly," *Douglas Oil*, 441 U.S. at 221 (internal quotation marks omitted) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683 (1958)); *see also Baggot*, 463 U.S. at 480 ("[T]he 'judicial proceeding' language of [(E)(i)] . . . reflects a judgment that not every beneficial purpose, or even every valid governmental purpose, is an appropriate reason for breaching grand jury secrecy.").

The government, in contrast, seeks blanket approval to disclose to a private contractor all grand jury material collected pursuant to thousands of grand jury subpoenas and presented in relation to nearly two hundred indictments, *see supra* Part I.B, arguing that disclosure of this vast body of evidence satisfies the first and second prongs of the Rule 6(e)(3)(E)(i) test because the material is connected with or preliminary to possible criminal trials in the nearly five hundred Capitol attack cases currently pending in this District. Gov't's Second Suppl. Mem. at 4. Such a sweeping disclosure of grand jury materials from multiple grand jury proceedings, on the grounds that these materials will be used in prosecuting and producing discovery in multiple criminal cases, has never been authorized in a single order, given the general understanding that (E)(i) contemplates a case-specific showing for necessity of disclosure to each "judicial proceeding" in relation to which the authorizing order is sought. The government's premise, that its proposed disclosure to Deloitte of material in hundreds of grand jury matters to facilitate its preparation for trial and production of exculpatory evidence to defendants in hundreds of individual criminal cases constitutes a disclosure "preliminarily to or in connection with a judicial proceeding," threatens to expand the scope of (E)(i)'s exception to grand jury secrecy beyond the narrow, discrete instances of disclosure anticipated in the text. The circumstances of

the government's request, then, do not unambiguously satisfy the first and second prongs of the Rule 6(e)(3)(E)(i) test.

This issue need not be resolved, however, because even assuming that the disclosure of grand jury materials to Deloitte constitutes a disclosure "preliminarily to or in connection with a judicial proceeding," the government has not carried its burden to demonstrate a "particularized need" for the disclosure.

### 2.  *Particularized Need*

The "particularized need" standard requires a showing that (1) the requested materials are "needed to avoid a possible injustice in another judicial proceeding; (2) the need for disclosure is greater than the need for continued secrecy; and (3) the request is structured to cover only material so needed." *In re Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986) (internal quotation marks omitted) (quoting *Sells Eng'g*, 463 U.S. at 443); *see also Baggot*, 463 U.S. at 480 n.4 (citing *Douglas Oil*, 441 U.S. at 222).  Ultimately, determinations of "particularized need" are committed to the "considered discretion of the district court," *Douglas Oil*, 441 U.S. at 228; *see also In re Sealed Case*, 801 F.2d at 1381 (recognizing the "substantial discretion of the district court"), but "that discretion is limited by the text of the rule," *Pitch v. United States*, 953 F.3d 1226, 1238 (11th Cir. 2020).

The balancing aspect of the particularized-need test means that "as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury [material] will have a lesser burden." *Douglas Oil*, 441 U.S. at 223.  Conversely, the "vital interests" upheld by grand jury secrecy "in (1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated,"

*McKeever*, 920 F.3d at 844 (citing *Douglas Oil*, 441 U.S. at 219), are at their strongest when a grand jury investigation, and grand jury proceedings, are ongoing.  Such is the case in the Capitol attack investigation.  This is an ongoing investigation of historic scope in which the government represents that "the number of cases presented to the grand jury and the number of subpoenas for documents will only continue to grow."  Gov't's Mot. at 3.  The government therefore carries a very high burden to justify disclosure under Rule 6(e)(3)(E)(i).  This burden is not met.

In explaining the particularized need to disclose sweeping grand jury material collected in hundreds of Capitol attack cases, for the ultimate purpose of preparing to prosecute and produce discovery in those cases, the government essentially contends that the increased efficiency and convenience of Deloitte processing and reviewing this complex evidence justifies the broad expansion of Rule 6(e)(3)(E)(i) it seeks.  First, the government claims that disclosure to Deloitte is necessary to avoid possible injustice in the Capitol attack cases because, without "Deloitte's assistance to engage in a complete and systematic review of all materials," Gov't's Second Suppl. Mem. at 4, and to create a "a single, secure, searchable database for discovery materials," *id.* at 6, the government will have to resort to alternative, and possibly less effective, means to "ensure defendants' complete, secure, and timely access to the materials to which they are entitled for trial preparations," *id.* at 5.  This system, in the government's view, will "ensure that materials that might have been obtained in the investigation of a particular defendant, but which ought to be provided to all defendants, are so provided."  *Id.* at 7.  Thus, according to the government, disclosure to Deloitte will enhance the government's ability "to comply with its discovery obligations" and to "protect defendants' right to a fair trial in an investigation that is of historic scope and significance."  *Id.* at 6.

While disclosure to Deloitte would offer the practical benefits of facilitating the population of "a single database" containing both grand jury materials and other data to "readily ensure" the production of materials to the parties "who are entitled to them" and of "ensur[ing]" that grand jury materials "are included in any database searches utilized by attorneys to identify material subject to disclosure," *id.* at 5, these benefits only make it easier for the government to comply with its discovery obligations to defendants.  The government must produce exculpatory evidence regardless of whether disclosure of grand jury materials to an independent contractor is authorized, and thus, the result of nondisclosure to Deloitte is not that defendants will be prevented from receiving some potentially exculpatory evidence within the grand jury materials, but that the government will be forced to develop a method of internally reviewing, processing, and producing protected materials.  The government acknowledges as much, noting that "removing [grand jury] subpoenas from responses before transferring the materials to the vendor, or conducting a review in an effort to do so, would be extremely time-consuming and burdensome," *id.*, but nowhere disclaiming its responsibility to undertake such steps.

Indeed, courts assessing requests for grand jury materials by defendants and by government attorneys seeking such materials for use in related civil cases have considered the analogous "possibility of obtaining information from alternative sources" as "an important factor" in the particularized need analysis.  *United States v. John Doe, Inc. I*, 481 U.S. 102, 116 (1987); *see also, e.g.*, *Sells Eng'g*, 463 U.S. at 444–45 (noting that district courts may consider the sufficiency of alternative discovery tools available to the agency seeking disclosure); *In re Grand Jury Procs. Relative to Perl*, 838 F.2d 304, 308 (8th Cir. 1988) (allowing disclosure of grand jury materials "unavailable through any other channel of discovery").  Just as relevant as these parties' ability to obtain information contained in grand jury materials without disclosure is

the government's ability to share information contained in grand jury materials without disclosure to Deloitte.  Thus, the government's capacity to satisfy its discovery obligations to defendants through means other than handing over grand jury materials to Deloitte in bulk—that is, by processing grand jury material internally—signals that its obligation to produce certain grand jury materials in discovery does not itself supply a particularized need for disclosure of all grand jury materials to a third-party vendor.

Perhaps recognizing this weakness in its argument, the government contends that "the efficiency and efficacy benefits of the requested disclosure order" may be taken into account "in considering particularized need."  Gov't's Second Suppl. Mem. at 5 n.1 (citing *John Doe, Inc. I*, 481 U.S. at 116; *In re Grand Jury Investigation*, 55 F.3d 350, 354 (8th Cir. 1995)).  Yet the Supreme Court has cautioned, as the government acknowledges, *see id.*, that "saving[s of] time and expense" alone cannot "justify a breach of grand jury secrecy."  *Sells Eng'g*, 463 U.S. at 431; *see also, e.g.*, *Procter & Gamble*, 356 U.S. at 682 (holding that avoidance of "delay and substantial costs . . . fall[s] short of proof that without [disclosure] a defense would be greatly prejudiced or that without reference to it an injustice would be done"); *Smith v. United States*, 423 U.S. 1303, 1304 (1975) (finding it "doubtful" that "sav[ing] . . . substantial investigatory and prosecutorial resources" warrants disclosure).  Thus, the added inconvenience and administrative burden of the government segregating, reviewing, and processing grand jury materials internally, without Deloitte's assistance, is not enough to support a finding of particularized need, even if these internal methods might be slower or marginally less accurate than the methods employed by Deloitte.  *Cf. In re Nov. 1992 Special Grand Jury*, 836 F. Supp. at 618 (concluding that government's representation that assistance of private auditors would "be of great value" in a

criminal investigation "falls far short of demonstrating that *any* injustice will result from government auditors going it alone" (internal quotation marks omitted)).

The government alludes more persuasively to the possibility that nondisclosure might result in some pieces of exculpatory evidence falling through the cracks as prosecutors toggle between multiple platforms for reviewing evidence, *see* Gov't's Second Suppl. Mem. at 5–6, and to the certainty that nondisclosure will "slow the discovery process" and "delay contemplated trial proceedings," *id.* at 6. These very real risks of delaying resolution of the Capitol attack cases, particularly as to defendants who have been detained pending trial, and of evidence being inadvertently omitted from discovery weigh in favor of disclosure.

Even assuming, however, that these risks rise to the level of injustices that might be avoided by disclosure to Deloitte, the government has not demonstrated that the second particularized-need consideration, that the need for disclosure be greater than the need for continued secrecy, is met. The government contends that "[a]lthough the overall grand jury investigation remains ongoing," assigning great weight to the interests of preserving secrecy, "the requested disclosure is designed to facilitate prompt access to relevant grand jury materials by defendants under indictment," Gov't's Second Suppl. Mem. at 6, citing to a number of pending Capitol attack cases in which the disclosure of grand jury materials to a defendant has been authorized, *see id.* at 6 n.3. The scope of the requested disclosure to Deloitte, however, far exceeds the materials that will be disclosed even to defendants under indictment. The latter documents disclosed to defendants presumably will be limited to the disclosure of those materials necessary for the government to comply with its discovery obligations in a specific case. The proposed disclosure to Deloitte, in contrast, reaches to all "grand jury matters related to the Capitol Breach," Proposed Order at 2, and includes all grand jury materials—whether

48

exculpatory or not and whether the information relates to any defendant or target of a grand jury investigation or only to a witness, a source, or a mere bystander—and therefore involves the sharing of more grand jury materials than the disclosures authorized in individual criminal cases.

In addition, disclosure to defendants is supported by the particularized need to comply with the government's constitutional obligation to produce exculpatory evidence directly to defendants in discovery, which necessarily outweighs the need for secrecy.  The government's desire to comply with that constitutional obligation by sharing information with Deloitte, however, does not carry same the weight.  As its explanation of the need for disclosure, the government points again to the increased efficiency and convenience of allowing Deloitte to manage all the data collected in the Capitol attack investigation.  *See* Gov't's Second Suppl. Mem. at 6.  "[D]elay and expense" may be "relevant factor[s] in the particularized needs analysis," but these matter most in cases where "[t]he threat to grand jury secrecy [is] minimal." *John Doe, Inc. I*, 481 U.S. at 116.  Here, the threat to grand jury secrecy posed by blanket disclosure to Deloitte is pronounced and cannot be outweighed by mere expediency.

The instant request raises significant risk of harming grand jury secrecy in the ongoing Capitol attack investigation in several crucial respects.  First, the general nature of the government's request to disclose *all* grand jury materials to Deloitte means that the materials to be disclosed may have been collected in connection with investigations of individuals who are never targeted, never charged, or exonerated.  Since the government's request is also prospective, applying to any related matters yet to be brought before a grand jury, *see* Proposed Order at 2, the materials to be disclosed to Deloitte may relate to individuals still under investigation who may be indicted or exonerated in the future.  Further, the government concedes that "the disclosure of all documents subpoenaed in connection with the Capitol Breach, together

with the subpoenas used to obtain those documents," may "reveal the scope or direction of the investigations arising out of the Capitol Breach."  Gov't Mot. at 3 n.1.  Unlimited disclosure of grand jury materials to Deloitte thus directly implicates the purposes of grand jury secrecy because it may "alert[]" potential "target[s]" of the ongoing investigation "who might . . . flee or interfere with the grand jury" and cause harm to individuals under investigation "who might later be exonerated."  *McKeever*, 920 F.3d at 844 (citing *Douglas Oil*, 441 U.S. at 219).  In addition, the anticipated disclosure of grand jury transcripts would reveal to Deloitte the identity of witnesses testifying before the grand jury, introducing the risk of chilling "the willingness and candor of witnesses called before the grand jury."  *Id.* (citing *Douglas Oil*, 441 U.S. at 219).

The government attempts to minimize these risks, arguing that disclosure to a private vendor "'which merely processes the documents and data and follows all government protocols for security'" should not lead to any of these recognized negative consequences of disclosure. Gov't Second Suppl. Mem. at 7 (quoting *LTSC Disclosure Decision*, 2011 WL 3837277, at *4); *see also id.* at 6–7.  As assurance, the government highlights that Deloitte's "personnel operate under strict confidentiality guidelines, . . . will further be admonished on the rules of grand jury secrecy, and . . . will act under the supervision of government attorneys."  *Id.* at 6 (citing Gov't Suppl. Mem. at 4–5).  As explained *supra* Part III.A, however, these precautions do not amount to government control over Deloitte and its personnel supporting the contract. The assumption that "disclosure to [government] attorneys poses less risk of further leakage or improper use" of grand jury materials "than would disclosure to private parties or the general public," *Sells Eng'g*, 463 U.S. at 445, does not extend to a government contractor who does not work exclusively for the government.  The safeguards built into the government's contract with Deloitte therefore do not assuage the concern that bulk disclosure to this private entity will

undermine the interests of grand jury secrecy, particularly in such a high-profile and historically significant investigation.

Nor does the government address the impact of mass disclosure on nondefendants who may be identified or whose information may be included in the grand jury material handed off to Deloitte.  These nondefendant individuals include not only witnesses whose testimony may be included in protected transcripts, individuals under investigation, and individuals who have been or will be exonerated by a grand jury, but also bystanders to and even victims of the events of January 6.  Within this massive dataset are "[l]ocation history data" and "[c]ell tower data for thousands of devices that were inside the Capitol building during the Capitol Breach," Gov't's Mot. at 2, and "[s]ubscriber information and two weeks of toll records for hundreds of phone numbers that were associated with a Google account identified from . . . [a] geofence search warrant," *id.* at 3.  This information, along with the millions of social media posts and other digital media collected by the government, *see supra* Part I.B, necessarily includes extensive data on nondefendants in the vicinity of the Capitol on January 6, for example, nonparticipating members of the public, congressional staffers, the press, law enforcement agents, and members of Congress, all of which were provided to the government under the auspices of grand jury secrecy and now would be made available to Deloitte in bulk.  Altogether, these very compelling reasons for preserving grand jury secrecy cannot be overcome by the government's desire to efficiently review, process, and produce discovery.

Finally, the government contends that its request for generalized authorization to disclose all present and prospective grand jury materials "is structured to cover only material needed to avoid the relevant injustice."  Gov't's Second Suppl. Mem. at 7 (citing *Douglas Oil*, 441 U.S. at 222).  In the government's view, since "the very point of the disclosure is to enable the

government to engage in a systematic review of all discovery materials in a single, secure platform," the request "cannot be reasonably be 'structured' any more narrowly." *Id.* As explained above, however, though the creation of a single, secure database would certainly make easier the government's systematic review and production of potentially exculpatory evidence, such a database is not necessary for the government to comply with its discovery obligations and therefore is not necessary to avoid injustice. The sweeping scope of the request, then, is tailored not to avoiding injustice, but rather to minimizing the government's discovery burdens.

The broad nature of the request further demonstrates the lack of particularized need shown by the government. A "blanket request" for disclosure of all grand jury materials even in a single case "cannot be described as the kind of particularized request required for the production of otherwise secret information" because "the breadth" of such requests necessarily "makes it virtually impossible for [movants] to demonstrate that each of hundreds [or here, thousands] of sought-after grand-jury items" must be disclosed. *United Kingdom v. United States*, 238 F.3d 1312, 1321 (11th Cir. 2001); *see also United States v. Davis*, 721 F. App'x 856, 861 (11th Cir. 2018) (same). The government, by seeking disclosure of all grand jury materials in an as-yet unknown number of cases, does not even attempt to make that individualized showing here, arguing instead that the purpose of this mass disclosure to Deloitte is to allow the government to determine what subset of the disclosed information must be shared with charged defendants.

Disclosures of grand jury information must be substantiated by more than a need for the government to separate efficiently the wheat from the chaff. To hold otherwise would be to lower "the exceedingly high burden of demonstrating a particularized need." *United States v. Tajideen*, 319 F. Supp. 3d 445, 473 (D.D.C. 2018). Particularized need has been found wanting

where defendants sought grand jury materials in their own cases to probe the accuracy of the government's instructions to the grand jury that indicted them, *United States v. Saffarinia*, 424 F. Supp. 3d 46, 80–81 (D.D.C. 2020), to challenge their indictment, *see, e.g.*, *United States v. Ahmed*, 94 F. Supp. 3d 394, 439 (E.D.N.Y. 2015); *United States v. Singhal*, 876 F. Supp. 2d 82, 98–99 (D.D.C. 2012), to investigate potential government misconduct, *Tajideen*, 319 F. Supp. 3d at 472–73, and to prepare a defense, *see United States v. Tingle*, 880 F.3d 850, 855–56 (7th Cir. 2018), among many other examples.  In all of these cases, disclosure was not authorized because the moving party had failed to make "a very clear and positive showing" of the need for the grand jury material.  *United States v. Bravo-Fernández*, 239 F. Supp. 3d 411, 415 (D.P.R. 2017) (internal quotation marks and citation omitted).  As precedent makes clear, a defendant charged with offenses stemming from the Capitol attack likely faces an uphill battle in seeking disclosure of the materials presented to the grand jury that indicted him.  Yet under the government's rationale and the two-step disclosure process it envisions, Deloitte, a private firm, would gain greater access to grand jury materials in all the Capitol attack cases than any individual defendant is entitled to receive in his own case.  The particular challenges of managing discovery in the Capitol attack investigation notwithstanding, the government has made no showing of a need particular enough or compelling enough to warrant this unprecedented expansion of Rule 6(e)(3)(E)(i).

In short, the government has failed to demonstrate a particularized need for the blanket disclosure of grand jury materials to Deloitte that it seeks and therefore has not satisfied the criteria under Rule 6(e)(3)(E)(i) for an order authorizing disclosure.

## IV.   CONCLUSION

For the foregoing reasons, Deloitte and its employees are not "government personnel" within the meaning of Rule 6(e)(3)(A)(ii) and the government has not made the requisite

showing of particularized need for an order authorizing disclosure under Rule 6(e)(3)(E)(i).

Disclosure of grand jury matters and related materials to Deloitte is therefore prohibited.

Accordingly, the government's Motion to Authorize the Disclosure of Grand Jury Materials is

**DENIED**.

An order consistent with this Memorandum Opinion will be entered contemporaneously.


Date:  July 16, 2021


_____
BERYL A. HOWELL
Chief Judge